

*Julia S. Whitefield, M.D., Ph.D.*
*Pediatric Emergency Medicine*
*5525 N. Stanton Street*
*Apt. 26 A*
*El Paso, TX 79912*

Telephone: 505.414.8768
Facsimile: 915.600.5610
E-Mail: JuliaWhitefield@msn.com

Ms. Karen Evans Esq.
The Cochran Firm
1100 New York Ave. NW
Suite 340 West Tower
Washington, DC 20005

Re: HW vs. USA and CNMC

September 20, 2019

Dear Ms. Evans:

Thank you for consulting me regarding the untimely death of HW, a 17-year-old African-American male, who succumbed secondary to the sequelae of HIV coupled with unrecognized and untreated syphilis, on October 5th, 2014. This report will illuminate certain details in his medical record, discusses my standard of care and causation opinions, the bases for these opinions and I will elaborate on the events that led to his death.

I have been practicing medicine since 1984. I initially worked for several months in a General Emergency Department through the University Hospital at the University of Colorado in Denver, Colorado, then during my residency in Pediatrics within the University of Colorado until 1987. Thereafter I worked for The Children's Hospital in Denver, Colorado within the Children's Hospital's Pediatric Emergency Department, a level I Trauma Center and Tertiary Care Hospital, as a receiving physician, as well as in three out of the four quadrants of Denver within its affiliated community-based hospitals, until 2000. While there, I established its Pediatric Emergency Departments, which fed into the Alma Mater of The Children's Hospital. I also established the first free standing Pediatric Emergency Department within the State of Colorado for The Children's Hospital. During all this time I was affiliated with the University of Colorado as clinical faculty.


PLAINTIFF'S EXHIBIT
14

1

In 2000, I moved to Indiana and started the first Pediatric Emergency Department in that state at St. Vincent Hospital in Indianapolis, Indiana (2000-2002). I then had the opportunity to work in a new Pediatric Emergency Department in Chattanooga, TN, which was associated with the University of Tennessee, where I remained until 2007. I then decided to move back to the Southwest and helped build up the Pediatric Emergency Department with the University of New Mexico in Albuquerque. After 8 years of academic medicine (2007-2015) I decided to move on to my last job with Providence Memorial Hospital, a private hospital in El Paso, TX. I am now associated with Texas Tech University as one of their clinical faculty. Please find my publications listed separately in my CV.

I have been working primarily in Pediatric Emergency Medicine since 1987. However, I have also practiced as locum tenens in general pediatrics in Denver. I am board certified in Pediatric Emergency Medicine through 2027 but remain board eligible for General Pediatrics through the American Board of Pediatrics by maintaining my certificate (MOC).

I am familiar with the national standards of care that apply to a reasonable and prudent Pediatric Emergency Department Physician regarding the appropriate evaluations, assessments and treatment of pediatric patients in the Emergency Department setting during the relevant timeframes. I am also familiar with the national standards of care that apply to a pediatric health care provider evaluating and treating pediatric patients, including patients up through 21 years of age, in an out-patient setting.

Attached please find the list of depositions I have reviewed and for which I have testified, and my updated CV.

### Materials Reviewed

My opinions are based on my education, my training, my extended experience as a Pediatric Emergency Department physician and as a pediatrician, my knowledge of the medical literature including the medical literature listed below, and my review of the following medical records:

- HW's Autopsy Report, Amended Autopsy Report, and report by the investigator through the Chief Medical Examiner's Office , and the 1/25/17 Neuropathology Report by Brent Harris, M.D.
- Unity Healthcare Policy: Health Assessment. Revision April 1, 2011
- D.C. Department of Health HAHSTA Notifiable Disease Report Form
- Printout of chart accesses at Unity Healthcare with dates
- Children's National Hospital: Final Discharge Summary and Discharge Instructions Policy, as of January 1988, revised prior to HW's death 6/2013
- Pamphlet on ED Rapid Oral HIV Screening Algorithm
- Children's National Hospital Policy on Final Discharge – Procedure, as of January 1988, revised prior to HW's death 6/2013
- Children's National Hospital Policy: HIV Screening in the Emergency Department, February 2014
- Children's National Hospital: Nursing Documentation in the Medical Record (1981 ff)
- Children's National Medical Center ER Visits 4/2/2013 through 10/4/2014

- Children's National Medical Center Admission: 10/4/2014-10/5/2014
- Unity Health Care Clinic Medical Records: 10/6/2-10 through 9/19/2014
- All labs through Children's National Medical Center and Unity Health Care Clinic
- DC Fire and EMS records
  - 5/17/2014
  - 9/23/2014
  - 10/3/2014
- Unity Healthcare Response to Interrogatories 3/6/2019
- CNMC Position Paper 9/10/2018
- Dr. Dawood's handwritten note stating that HW was not his patient

**Literature and Data:**

1. Infectious Diseases in Children: USPSTF recommends syphilis screening for asymptomatic adults, adolescents. Healio.com/Pediatrics: July 2016, p. 26-27
2. Fleisher and Ludwig Textbooks of Pediatric Emergency Medicine varying editions through 6th edition, 2010
3. Nelson, Textbook of Pediatric, varying editions through 19th edition, 2011
4. CDC MMWR Sexually Transmitted Diseases Treatment Guidelines, 2010
5. District of Colombia Department of Health Section 7. Sexually Transmitted Diseases
6. Diagnosis and Management of Syphilis. Brown, D. and Frank, J: www.aafp.org/afp 68(2), 2003: 283-290
7. District of Columbia: Syphilis Rate, 2012
8. District of Columbia: Syphilis Rate, 2013
9. NAPNAP Position Statement on School-Based Health Care: www.jpedhc.org 27(3), 2013
10. National Coverage Determination (NCD) for Screening for Sexually Transmitted Infections (STIs) and High-Intensity Behavioral Counseling (HIBC) to Prevent STIs (210.10): https://www.cms.gov/medicare-coverage-database/details/ncd-details: 2011
11. Neurosyphilis: An Unresolved Case of Meningitis. Ahsan S., Burrascano J.: Case Reports in Infectious Diseases, 2015 Article ID 634259
12. Primary and Secondary Syphilis – United States, 2005-2013. Patton M., Su J., Nelson R., Weinstock H.: MMWR 63(18), 2014
13. CDC Fact Sheet: Reported STDs in the United States 2012
14. CDC Fact Sheet: Reported STDs in the United States 2013
15. Sexually Transmitted Disease Surveillance 2012. Division of STD Prevention January 2014, U.S. Department of Health and Human Services, CDC
16. Syphilis and HIV: a dangerous combination. Lynn WA and Lightman S. The Lancet Infectious Diseases Vol 4, 2004, pp 456-466
17. CDC Quick Reference Guide – Laboratory Testing for the Diagnosis of HIV Infection: Updated Recommendation: June 2014 https://stacks.cdc.gov/view/cdc/23446/cdc_23446_DS1.pdf?download-document-submit=Download

18. Foxman B, Zhang L, Tallman P, Andree BC, Geiger AM, Koopman JS, et al. Transmission of uropathogens between sex partners. *J Infect Dis*. 1997;175:989–92.
19. Khan AJ, Schaeffer HA, Evans H. Urinary tract infection in adolescent boys. *J Natl Med Assoc*. 1996;88:25–6.
20. Assi R, Hashim PW, Reddy VB, Einarsdottir H,Longo WE, Sexually transmitted infections of the anus and rectum,  World J Gastroenterol. 2014 Nov 7; 20(41): 15262–15268. Published online 2014 Nov 7. doi: 10.3748/wjg.v20.i41.15262
21. ED Charting and Coding: Physical Exam (PE) Fan, T et al., Aliem, November 2016 https://www.aliem.com/2016/11/charting-and-coding-physical-exam/
22. Documentation Pearls and Pitfalls in the Physical Exam.  Lemanski Mike, Lempert Hamilton August 9, 2016, https://www.acepnow.com/article/documentation-pearls-    pitfalls-physical-exam/
23. ED Charting and Coding: Physical Exam (PE) Fan, T et al., Aliem, November 2016 https://www.aliem.com/2016/11/charting-and-coding-physical-exam/
24. https://www.cdc.gov/std/syphilis/syphilismsm-2017.pdf
25. https://www.ncbi.nlm.nih.gov/pubmed/15219556
26. https://www.cdc.gov/std/syphilis/syphilismsm-2017.pdf

**HW's Medical History Summary**

HW was an athletic 17-year-old male high school student who was in good health. From 2010 – October 2014, he obtained his regular physical examinations, and his primary health care from Unity Health at Eastern High School Student Healthcare Center, 1700 East Capital Street NE, Washington, DC 20003-1622.  In addition, he obtained care for acute conditions from Children's National Health Care System's Emergency Departments at UMC and later at the main campus ED, eventually being admitted to the Children's National Hospital on October 4, 2014.

**October 6th, 2010**: HW was seen at Unity Healthcare by Abayomi Hendje MD for hematuria and a burning sensation with urination. He was 13 years old at that time and denied sexual activity; he described the urine as bloody and more frequent. He denied any sexual history, but his parent was documented to be present.  Tests for chlamydia and gonorrhea, were sent. Only a urine dip stick test was done, not a microscopic examination. I found no records of any urine culture done.

It is highly unlikely for a 13-year-old healthy male to get a urinary tract infection without a urinary tract abnormality or a positive sexual history. Urinary tract infections most commonly occur in older men with prostatic disease, outlet obstruction or urinary tract instrumentation. These infections *occasionally* occur in young men who participate in anal sex (exposure to *E. coli* in the rectum), who are not circumcised (increased *E. coli* colonization of the glans and prepuce) or whose sexual partner is colonized with uropathogens. (18, 19, 20)

**July 23rd, 2012:** HW was seen at Unity Healthcare, specifically requesting STD testing. He was seen by Andre Douglas, NP. He denied any symptoms, but there was no explanation as to why he wanted to be tested for STD's. He described his partners as female and stated he always used a condom. He only received a urinalysis, Gonorrhea and Chlamydia testing and an oral swab for HIV.

**August 14th, 2012:** HW received a scheduled physical examination by Aima Payton, NP at Unity Healthcare at the Eastern Student Health Center. He described his sexuality as heterosexual, using condoms always. He also reported that the number of his lifetime sexual partners was five. Of note, this was the last time this question was ever asked of HW by anyone from Unity Healthcare. He was offered another HIV test but declined, as it had been done the month prior.

**October 10th, 2012:** HW was seen again by Aima Payton, NP, at Unity Healthcare at Eastern High School Based Clinic. He was treated symptomatically, and the patient was discharged.

**March 19th, 2013:** 5 months later HW was seen, again by NP Payton, at Unity Healthcare at Eastern High School Based Clinic for complaints of a sore throat, nasal congestion and coughing. His Social History was updated on this date; he again answered that he used condoms; that he had had sex in the past 12 months; and that he had no history of STD's. However, he also reported that his sexual partners were *male and it is documented that he was not having oral or anal sex.* This was the first documentation that he was sexually active with men (MSM) yet NP Payton failed to inquire about the nature of his sexual activities with men. This should have turned on a red light for NP Payton regarding anticipatory guidance. Despite this, NP Payton failed to obtain any further information regarding his sexual activities with males; how many sexual partners he had had in the past year; the number of new partners, or the number of lifetime sexual partners. NP Payton also failed to test HW for syphilis and other STD's, which were required by the standard of care as of that date.

**April 2, 2013:** HW presented to CNMC ED at United Medical Center (UMC) with a diffuse rash, described as erythematous and maculopapular on his trunk and extremities by the ED physician, Fareed Reza Saleh. No social and sexual history was obtained. HW's mother was with him in the ED. A thorough social and sexual history should have been taken in the proper, private respectful environment as required by the national standard of care and not in the presence of his Mother. Instead, the CNMC ED physicians sent HW home with Benadryl for his rash. They did not include a sexually transmitted disease in their differential diagnosis. These were violations of the National Standards of Care The CNMC provider should have taken his history, including history of present illness, and past medical history. HW's social and sexual history should have been obtained privately to come up with an appropriate differential diagnosis and formulate a workup plan. Fleisher and Ludwig Textbooks of Pediatric Emergency Medicine varying editions through 6th edition, 2010; Nelson, Textbook of Pediatric, varying editions through 19th edition, 2011. A social and sexual history should have been taken in the proper, private respectful environment as required by the national standard of care and not in the presence of his Mother. Had that been done, more likely than not, the physician would

have discovered that HW was MSM, which should have raised suspicion that this teenaged male living in Washington, DC, an epicenter for HIV at this time, who was sexually active with males, was perhaps experiencing a syphilitic rash and required testing. STD testing to include HIV and Syphilis testing should have been offered. It is not uncommon for persons to be co-infected with more than one STD. Failure to obtain HW's social and sexual history and to test HW for STDs, including HIV and Syphilis, were violations of standards of care.

**August 5, 2013:** HW presented to CNMC ED at UMC complaining of abdominal pain rated at 8; he was also hyperventilating. His temperature was 102 degrees; heart rate was elevated at 119, and respiratory rate was tachypneic at 36. He had been unable to have a bowel movement; his mother reported she had given him a laxative with no results. Dr. Sophia Smith elicited that HW had dysuria and she suspected a UTI. She asked him about his sexual history; however, HW's mother was present. It is well known that adolescents may not always provide accurate sexual history information, and that this is especially true when a parent is present. Why did Dr. Smith not follow through with her suspicion? All she had to do was ask HW if she could test him for HIV and other STDs, including Syphilis. This was a missed opportunity for HW to be diagnosed and treated, if positive, for Syphilis. And if she had the suspicion of a UTI, perhaps he had tenesmus after anal intercourse, especially in an MSM male living in Washington D.C., the epicenter then for HIV?

Urinary tract infections in the non-circumcised male. In Fleisher and Ludwig as cited 6th ed. page 934, in summary it states that in the male > 6 months and the female > 2 years without bacteriuria and negative leucocyte esterase and nitrates a urinary tract infection is highly unlikely. Nelson's 19th ed. P.1855 describes the same more eloquently: UTI's are 10-15 times more common in the uncircumcised infant and there is an increased risk up to age 5 years. Thereafter it finds no difference. Circumcision reduces the risk of sexually transmitted disease in adults in particular AIDS. The CDC considered whether to recommend routine circumcision for male newborns to reduce the risk of HIV transmission in the future. .

Urinary tract infections most commonly occur in older men with prostatic disease, outlet obstruction or urinary tract instrumentation. These infections occasionally occur in young men who participate in anal sex (exposure to *E. coli* in the rectum), who are not circumcised (increased *E. coli* colonization of the glans and prepuce) or whose sexual partner is colonized with uropathogens. Foxman B, Zhang L, Tallman P, Andree BC, Geiger AM, Koopman JS, et al. Transmission of uropathogens between sex partners. *J Infect Dis.* 1997;175:989–92. It is unusual for a young man without anatomic concerns to have a urinary tract infection. Khan AJ, Schaeffer HA, Evans H. Urinary tract infection in adolescent boys. *J Natl Med Assoc.* 1996;88:25–6.

The CNMC ED provider should be knowledgeable about the incidence of UTIs in adolescent males. She should have taken his history, including history of present illness, past medical, social and sexual history privately, and come up with a differential diagnosis and formulate a workup plan. She should have sought HW permission to test him for STDs.  Dr. Smith should

have included a complete workup for STDs with a CBC, differential, CRP, ESR, a serum test for HIV and Syphilis and complete urinalysis with urine culture and urine test for Chlamydia and Gonorrhea. 24, 25, 26 are more specific resources for MSM but Nelson's (3) chapter 114 and here in particular p 707 Table 114-2 describes 'Routine Laboratory Screening Recommendations for Sexually Active Adolescents and Young Adults: Chlamydia trachomatis AND Neisseria gonorrhoeae, HIV, Syphilis, Hepatitis C Virus'. The last two bulleted points of the table under 'NO RECOMMENDATIONS" states that

- although routinely one would not screen the asymptomatic adolescent for trichomoniasis, bacterial vaginosis, genital herpes infection, HPV, HAV, or HBV, the
- Young MSM and pregnant female may require more thorough evaluations and assessments.

This was quoted from the Centers for Disease Control and Prevention: Sexually transmitted diseases treatment guidelines, 2010, MMWR 59(No. RR-12):1-110, 2010.

Dr. Smith violated national standards of care because she failed to obtain an accurate sexual history in the appropriate private and confidential setting, and she failed to order full STD testing, including Syphilis, although she had some clues for this date as she described in her deposition. Instead, she ordered an antibiotic and wrote that she would notify HW's mother about the results of the urine culture she ordered. That culture returned as revealing enterococcus faecalis, which is a very unusual organism to grow from a male who is **not** sexually active and is **not** MSM.

Enterococcus faecalis is naturally present in the gastrointestinal tract, *and* is found in fecal matter. The fact that these bacteria grew in HW's urine and that he had a positive urine culture to begin with should have raised a huge index of suspicion that HW was sexually active and that she needed to test him for STDs, including Syphilis and HIV. However, no action was taken regarding STD testing or this urine culture result. These were all violations of standards of care. Further, there is no documentation as required by the national standard of care that the follow up Dr. Smith indicated was actually accomplished. Nobody appears to have followed up on this unusual organism and placed it in the right clinical circumstance. Again, this was a violation of the standard of care and a missed opportunity to diagnose a STD in this teenager. In my opinion, with appropriate follow up and reporting H.W. would have been tested for syphilis and HIV. Then we would know for sure when he contracted syphilis. The failure to test him for syphilis on this date deprived him of an opportunity to be diagnosed and treated for syphilis in a timely fashion.

Physician notes were sent to Dr. Dawood rather than to Unity Healthcare, which was also a violation of HIPAA and National standards of care. CNMC was required by their own policy to send the ED clinician's discharge notes to HW's PCP and in failing to do so, failed to ensure continuity of care.

**January 30, 2014**: HW received a physical examination for track participation at Unity Healthcare at Eastern High School Based Clinic. NP Payton updated his sexual history again: his

sexual partners were still _male_; he reported one partner in the past 12 months. However, there was no information regarding number of lifetime partners, nor number of new partners; and although HW reported that he 'always' used condoms, and denied having either anal or oral sex, NP Payton failed to ask him _what kinds_ of sexual contacts he was having with his male sexual partner(s). The section on Social History and Advice does not at all address his sexuality. Once again, no syphilis testing was ordered.

**March 18th, 2014:** HW presented to NP Payton at Unity Healthcare at Eastern High School Based Clinic with a frontal headache starting that day. The school nurse records indicate that HW had gone to see her earlier that day and he had been referred to the Unity clinic for his headache. At the Unity clinic, HW's sexual history was not updated, although the previous MSM sexual history information obtained on January 30, 2014 appears in the record on this date. Again, NP Payton failed to inquire as to _what_ sexual activities he was having with his male partner(s), since HW was reporting that he was not having either anal or oral sex. His physical examination was minimal at best and lacked a neurological examination. He was treated with Pharbetol (acetaminophen) for the headache. Once again, no syphilis testing was ordered.

**May 5th, 2014:** HW was seen at the Unity Healthcare at Eastern High School Based Clinic for arm pain, seen again by NP Payton. This was his third visit that year. His sexual history was not updated; however, it was still documented that his sexual partners were _male_; that he engaged in neither oral nor rectal sex; and that he always used condoms. Yet again, NP Payton failed to obtain an appropriate and thorough sexual history, because **how was he having sex,** since he was sexually active? She again failed to test him for Syphilis. The physical examination performed by NP Payton was minimal. No final diagnosis was made, other than related to the chief complaint. No syphilis tested was ordered or performed..

**May 17th, 2014:** HW was taken to CNMC ED at UMC by ambulance for complaints of abdominal pain for 7 (seven) days without a bowel movement. The DC Fire and Rescue records documented that HW was having "trouble breathing secondary to abdominal pain", and his pain was rated at 7/10. By the time he reached the CNMC ER, his abdominal pain was rated a 10/10. He was seen by Mohsen Saidinejad MD, who documented HW was anxious and hyperventilating; his pain was 7/10; his abdominal pain began 7 days prior, and he had not had a BM in a week. Dr. Saidinejad listed HW's social history as "Not significant". Dr. Saidinejad admits, as stated in CNMC's Position Paper, that he never took a sexual history, which would have been pertinent given H.W.'s complaints, sexual history and the environment at the given time, being the epicenter of HIV in Washington D.C. for HIV. Where there is HIV, there is Syphilis. D.C. also had a high rate of syphilis infections at this time. Dr. Saidinejad ordered two fleets enemas; and discharged him with diagnosis of constipation and MiraLAX.

First, these ED providers should have been aware of the national and local infectious disease trends. Second, it is highly unusual for an otherwise healthy teenager to have constipation for a week, which is severe enough to go to the ED. A chief complaint of constipation typically happens to the infant or toddler because of dietary issues. This in itself should have warranted

a high index of suspicion. An ED physician working in an urban ED, and especially in Washington, DC, the epicenter of the HIV epidemic, should have been aware that men having sex with men (MSM) have a high incidence of constipation and tenesmus secondary to rectal trauma and anal fissures. Sexually transmitted infections of the anus and rectum, World J Gastroenterol. 2014 Nov 7; 20(41): 15262–15268. Published online 2014 Nov 7. doi: 10.3748/wjg.v20.i41.15262 and its references details nicely this point. Yet Dr. Saidinejad listed HW's social history as "Not significant", and did not ask about his sexual history, which violated National standards of care. He also missed that he had been seen for abdominal pain in August 2013. All of this information was in the CNMC computer records. Why abdominal pain twice? Why UTI with enterococcus faecalis? He should have looked at the prior CNMC ER visits. Had he done so, he would have discovered that HW was diagnosed with a UTI 9 months ago; that the culture revealed enterococcus faecalis; and that there was no documented follow up. There is no documentation that he did any of this, which were violations of the National Standard of Care.

Fleisher and Ludwig, in Chapter 13 Constipation p.187 provides as follows: "The evaluation of the child presumed to have constipation should begin with a thorough history and physical examination. Special attention should be paid to the age of the patient, duration of symptoms…pain with defecation, rectal bleeding, presence of abdominal distention and/or palpable feces, and a rectal exam to assess anal position, sphincter tone, widening of the rectal vault, and presence of hard stool…Constipation is not a disease; it is a symptom of a problem. Constipation is acute when it has occurred for less than 1 month's duration…"

Dr. Saidinejad was required by the National Standard of Care to obtain a focused history of present illness, a past medical history including HW's social and sexual history. Dr. Saidinejad was required to take time to obtain a focused social and sexual history in the proper environment and manner (assuring HW of confidentiality and giving him privacy). Ask the questions posed above. This would have been the Standard of Care – then and now. Dr. Saidinejad's history taking was clearly incomplete, as further evidenced by the fact that he did not even note that HW had been seen just 12 days prior at his primary care provider's. These failures violated National standards of care.

Dr. Saidinejad was also required by the National Standard of Care to perform an appropriate physical examination including at least an anal inspection if not rectal examination to figure out why this young teenaged male was so anxious, having so much pain and could not pass stool. If he had done so, we would know, for example, if HW had the rash on his buttocks seen in the autopsy photos, which if present, would and should have led to further inquiry and testing. He then needed to formulate an appropriate differential diagnosis to include abdominal pain specific illnesses, including urinary tract infection. These failures also violated National standards of care.

The national standard of care required Dr. Saidinejad to seek H.W.'s permission to test for HIV, syphilis, and order laboratory tests to include CBC with differential, CMP, CRP, ESR, liver

enzymes, urine drug screen, blood culture, ELISA test (serum) for HIV and urinalysis with urine culture and abdominal pain specific radiologic studies. More likely than not, if these tests were performed, it would be known if HW's urinary tract infection was cleared, that he was HIV negative, whether or not he was infected with syphilis, and the presence or absence of the rash on his buttocks.  These failures violated National standards of care.

Physician notes were sent to Dr. Dawood rather than to Unity Healthcare, which was also a violation of HIPAA and National standards of care.  CNMC was required by their policy to send the ED clinician's discharge notes to HW's PCP and in failing to do so; failed to ensure continuity of care.

**September 10th, 2014:** H.W. visited the Unity Healthcare clinic at Eastern High School Based Clinic and was seen again by NP Payton; and again, specifically requested STD testing. He stated that he had had sex with 2 female partners with 'intermittent use of protection'. He denied penile discharge or irritation and denied any other concerns – except STD's. No physical examination was conducted. Again, we would know if the rash on his buttocks, less than 30 days later was present. His sexual history was updated: he still reported male sexual partners; he reported two sexual partners in the last 12 months; he reported that he had sex in the past 12 months; yet he denied oral or anal sex. Really? Again, no information was asked regarding what sexual activities he had been having with his male sexual partners. While one understands that it takes an open mind to take these histories, it is the same nurse practitioner who had been doing so. If she did not feel comfortable, she needed to turn it over to somebody who was. The physical examination consisted of Vital Signs and General Appearance.
His issue was that he was having 2 new female partners, with only intermittent use of protection, along with his MSM status,, none of which were addressed, which instantly made him an even higher-risk patient, requiring complete STD testing, including Syphilis, yet only non-ELISA HIV, Chlamydia and Gonorrhea tests were performed.  These were all obvious violations of National Standards of Care.
The appropriate evaluation, if not referral, should have included as required by a physician or physician extender to order laboratory tests to include but were not limited to CBC with differential, CMP, CRP, ESR, liver enzymes, urine drug screen, blood culture, ELISA test (serum) for HIV, serum test for Syphilis, complete urinalysis with urine culture. None of this was done.

**September 19th, 2014:** HW was seen at the Unity Healthcare Center at Eastern High School Based Clinic for a headache and rhinitis. The NP stated his risk for HIV was negative; however, the updated sexual history once again documented that he was MSM; he described having had 2 male partners; yet he denied oral or anal sex. Alicia Baker was his nurse practitioner. NP Baker also failed to take a thorough sexual history and failed to test him for Syphilis. She failed to appreciate the risk associated with undiagnosed STDs. He admitted to sex with men and women, so why not follow through with the consequence? What else could it be? After the physical examination, which was reportedly unremarkable, no further differential diagnoses were considered, and HW was discharged home on Ibuprofen and Loratadine.

**September 21st, 2014:** HW was seen at CNMC for a headache for the past three days, abdominal pain, sore throat and fever. His rapid strep test was negative, but he was treated with penicillin nonetheless because he had 'exudates', an erythematous throat and 2-3+ tonsils. He also had submandibular lymphadenopathy. His headache was 6/10. His physician was initially Dr. James Francis Martin. At discharge his pain was 5/10. HW's social history was again listed as "Not significant." According to the CNMC's Position Paper Dr. Martin never asked him about his sexuality. It appears from the documentation that his sexuality was never considered and that the differential diagnosis was hence incomplete. Acute retroviral syndrome should have been on the differential diagnosis. As such, an HIV test was required. The failure to take HW's sexual history and test HW for HIV (serum ELISA) on this visit and each subsequent visit was a violation of the national standard of care. Had a focused sexual history been obtained in the proper, private setting, HW's MSM status would have been elicited, and whether his history of MSM was elicited or not, he should have been tested for HIV. Had those tests been done, both HIV and syphilis would have been timely diagnosed, treated, and HW would have survived. In my opinion, HW had both Syphilis and HIV at the time he presented to CNMC on this date and thereafter.

A reasonable and prudent physician, according to National Standard of Care, always has to ask: what else might it be? And in this case, if not strep, what else might it be in a teenaged African American male living in Washington, DC, the epicenter of the HIV epidemic. But, of course, if one does not take that history, that window of opportunity is completely gone. The previous medical record (having visited for 'constipation') was easily available, a complete history needed to be taken as stated above. These failures again violated standards of care.

The national standard of care required the CNMC physicians to order laboratory tests on this date to include CBC with differential, CMP, CRP, ESR, liver enzymes, urine drug screen, blood culture, ELISA test (serum) for HIV, and urinalysis with urine culture and the throat swab, which was done. HIV, a viral infection, namely retrovirus, can acutely present like a viral infection and needed to be included in the differential diagnosis. HW likely was experiencing an acute HIV infection at this time. Any ED visit is a portal and needs to be seen as such a window of opportunity. If one does not formulate differential diagnoses, one misses those windows. The failure to perform these tests were a violation of the national standard of care. Instead, HW was discharged with a diagnosis of strep throat, despite the negative strep test.
Physician notes were sent to Dr. Dawood rather than to Unity Healthcare, which was also a violation of HIPAA and National standards of care. CNMC was required by their policy to send the ED clinician's discharge notes to HW's PCP and in failing to do so, failed to ensure continuity of care.

**September 23rd, 2014:** HW returned via EMS in the early morning hours, to the same CNMC at UMC ED. The EMS records indicate he had abdominal pain; a headache for the past 4 days; "can't sleep"; and his pain was an 8/10. He was seen by Dr. Alexandra Rucker. In the ED, his fever was 101.3. She documented the four days of headache, sore throat and maximum fever

to 102. The National Standard of Care requires an ED physician to conduct an appropriate medical history and physical examination.  This was not done on September 23, 2014, which delayed the diagnosis and treatment of H.W.'s HIV and syphilis infection, which resulted in H.W.'s death. He still had abdominal pain, which she noted was 8/10. She also noted that he complained of dizziness with standing/walking. She knew he had been seen on 9/21/14; he again had erythema with exudates; 3+ tonsils, and a questionable ulcer on his tonsil; his electrolytes were grossly abnormal with a sodium of 160 mmol/l - at the seizure threshold. Nonetheless, he received merely symptomatic treatment, no definitive diagnosis was made; his electrolytes were corrected, and he was discharged, despite the fact that Dr. Rucker noted "meningitis less likely".

Dr. Rucker did note during this visit that HW's primary care physicians were at Unity Healthcare; however, she failed to contact them for more information on HW, nor were her notes sent to Unity Healthcare.  No further workup was done; no proper sexual history was obtained; and her final diagnosis was migraine headache, despite the fact that migraines do **not** cause fevers, nor erythematous throats with swollen tonsils and exudates; nor abdominal pain. These failures violated National standards of care. What was the differential diagnosis? This was the second time for the same chief complaint within two days. Meningitis was in her differential, yet she did nothing to investigate or rule that out, which also violated standards of care. Once a diagnosis is on the differential diagnosis, one must take action to rule it out. On this date, HW should have been admitted for a full work up of his signs and symptoms, which pointed to an infectious etiology, including bacterial meningitis. Had HW been admitted for an infectious disease work up, his HIV and Syphilis would and should have been timely diagnosed and treated successfully, preventing his death. Had Dr. Rucker also merely called his primary care provider at Unity Healthcare to ask for information on HW, as she should have done, she would have learned that HW was MSM, and she would and should have diagnosed his HIV and Syphilis on this date.  Instead, she sent him home, which violated national standards of care. Moreover, since Dr. Rucker considered viral syndrome, given his symptomatology she should have considered acute retroviral syndrome (RVS) and ordered an HIV test. Per the CNMC policy this should have been an ELISA test. Her failure to consider acute retroviral syndrome was also a violation of National standards of care.

The national standard of care required Dr. Rucker to order laboratory tests to include but were not limited to CBC with differential, CMP, CRP, ESR, liver enzymes, urine drug screen, blood culture, ELISA test (serum) for HIV, serum tests for Syphilis and urinalysis with urine culture, and a CAT Scan (and if normal) prior to performing of a lumbar puncture with opening pressure and full evaluation of the cerebrospinal fluid (CSF) including cell count, gram stain to include evaluation for syphilis, glucose, protein and CSF culture.

Physician notes were sent to Dr. Dawood rather than to Unity Healthcare, which was also a violation of HIPAA and National standards of care.  CNMC was required by their policy to send the ED clinician's discharge notes to HW's PCP and in failing to do so, failed to ensure continuity of care.

**September 29th, 2014:** HW was seen a **third time** at the CNMC ED at UMC, again for headache and abdominal pain; Triage noted he had been previously seen on 9/23/14 and diagnosed with "migraines and *fever without a source*"; that he had had the fever for the past 3 days; and he had now had vomiting.  HW was seen by Dr. Mohsen Saidinejad again, whose notes about HW's signs and symptoms contradicted both *himself* and the notes by the ER nurse regarding fever, vomiting and abdominal pain. Once again, the social history was listed as "Not significant". His headache was 8/10; HW was obviously dehydrated; he was still complaining of dizziness; in addition he was now vomiting; yet no laboratory testing was done on this patient who was returning for the third time within 8 days, nor was HW admitted for a full work up of his signs and symptoms, as would have been required by National Standards of Care. The physical examination lacked an adequate neurological examination and he was sent home with Ibuprofen, with a diagnosis once again of migraine, despite the fact that the patient's presentation, signs and symptoms were completely inconsistent with a diagnosis of migraines.
The question remained: why had the same patient returned three times for the same signs and symptoms? Obviously, it was unresolved and indeed was worsening. Where was the differential diagnosis? There was again a failure to call his primary care provider to obtain more information about HW.

What should have been done on 9/29/14 was an appropriate history of present illness, including the chief complaint (why was he returning the third time – always a warning sign), an appropriate past medical history (now even more complete than the last one including the social and sexual history), an appropriate physical examination, formulation of a differential diagnosis and a workup plan:
The national standard of care required Dr. Mohsen Saidinejad to order laboratory tests to include but were not limited to CBC with differential, CMP, CRP, ESR, liver enzymes, urine drug screen, blood culture, ELISA test (serum) for HIV, serum test for Syphilis and urinalysis with urine culture, a CAT Scan of his head prior to, and if it was normal to include performance of a lumbar puncture with opening pressure and full evaluation of the cerebrospinal fluid (CSF) including cell count, gram stain to include evaluation for syphilis, glucose, protein and CSF culture. These failures violated National standards of care.

Given the persistent worsening of his symptoms, the National Standard of Care required the CNMC ED provider to contact H.W.'s primary care provider to be sure they were not missing vital information. If this had been done, CNMC would have discovered that Dr. Dawood was not H.W.'s primary care provider and this information should have been corrected administratively to assure continuity of care.  Moreover, CNMC would have learned of H.W.'s MSM history, which would and should have been obtained; his HIV and syphilis would have been timely diagnosed and would have been successfully treated. These failures were violations of National standards of care.

Instead, HW was negligently sent home a third time with a physician note saying he could return to school the next day. The ER physician never asked whether HW had been able to even attend school for the past 8 days; had he asked, he would have been informed HW had been

too sick to go to school, except for a brief time on this date. Dr Saidinejad advised HW to follow up with Dr. Dawood and with the Neurology clinic for his "migraines". Ironically that follow up date was beyond his date of death. Yet he failed to notice that HW's PCP was *not* Dr Dawood; it was the providers at Unity Healthcare Clinic. But most importantly HW should have never been sent home, he should have been admitted, which would have been lifesaving as he would have received appropriate treatment and supportive care. These failures violated National standards of care.

**September 30th, 2014:** HW returned for the 4th time to CNMC; the Triage nurse noted he had had "head, stomach pain for 2 weeks now, **positive for fever**"; she also noted this was his **fourth** ED visit; he complained of "pain all over", with a pain level of 10/10. ER physician Dr. Joanne Cohen noted the above information; his diffuse abdominal pain and worsening headache, the latter having been present for eleven days, as well as HW's vomiting times three that morning. She also wrote that "This is patient's 4th visit for same complaint". However, Dr. Cohen **inaccurately** noted that HW *has not had a documented fever either here or at home, but reports tactile* fevers *yesterday"*. She listed HW's Social History as "Not significant". She ordered a CT of his Head, which was negative. The national standard of care required a lumbar puncture! Re-exam revealed his headache was still 8/10. The identity of HW's primary care provider was not elicited, nor was his primary care provider called, despite this being HW's fourth CNMC ED visit in 9 days, both of which were violations of Standards of Care but also show a certain degree of non-caring. Physicians who swear by the oath of hypocrites are supposed to show a certain degree of humanity!

Dr. Cohen's differential diagnoses included migraine, viral syndrome, dehydration and central nervous system tumor. So she was obviously worried about a central nervous system process, but it lacked other bacterial differential diagnoses and completely  ignored any differential diagnoses related to sexuality, which is unusual for a physician working in an ED and a pediatric ED in the epicenter of HIV at the time in Washington D.C., whom one would hope  would keep herself educated regarding prevalence of such viruses and differentials related to such diseases, as required by National standards of care.

But instead she prescribed Valproic Acid, at 15:12 for his headache which was 5/10, and turned over his care at shift change to Dr. Rajesh Kirit Daftary. He diagnosed HW with migraine headaches once again and discharged him at 16:00 hours that day. No laboratory evaluation had been done, and the true diagnosis was obviously missed, which violated National standards of care. The patient should have never been discharged; he should have been admitted for a thorough work up for an infectious etiology of his signs and symptoms, as required by National standards of care. Instead, he was discharged with instructions to follow up with Dr. Dawood, a physician he never knew, and to go to the CNMC Neurology Clinic "within 2 to 4 weeks". HW was dead five days later instead.

What should have happened on 9/30/14, beyond admission and the CT of his head, was the following:

The national standard of care required both Drs. Cohen and/or Dr. Daftary to order laboratory tests that were to include but were not limited to CBC with differential, CMP, CRP, ESR, liver enzymes, urine drug screen, blood culture, ELISA test (serum) for HIV, serum testing for Syphilis and urinalysis with urine culture and to include performance of a lumbar puncture with opening pressure and full evaluation of the cerebrospinal fluid (CSF) including cell count, gram stain to include evaluation for Syphilis, glucose, protein and CSF culture after they knew, that the CAT of his head was normal.

This would have led to the diagnosis of HIV earlier, the diagnosis of Syphilis earlier, prompted the appropriate treatment and supportive care and saved his life and prevented further pain and suffering. The failures to do any of the above violated National standards of care.

**October 3rd, 2014:** On that Friday afternoon, HW was taken via EMS to CNMC ED at UMC. The EMS records indicated HW was agitated, anxious, vomiting, had chills, and a "general sickness." He was found lying in bed hyperventilating.  HW's mother gave a history to the EMS; the EMT noted that *"Pt is being uncooperative at this time."* HW was noted to be cool to the touch; he was complaining of abdominal pain; and his mother told EMT's that he had not had anything to drink or eat in the past few days. HW had to be brought outside to the ambulance via a stair chair.

In the CNMC ED at UMC – his **fifth visit in 12 days, Triage noted HW's abdominal pain, a fever off and on for the past two weeks; nothing by mouth since Wednesday, and pain of 10/10.** Dr. Robert Felter saw HW, noting persistent vomiting times two days and abdominal pain, as well as signs of dehydration.  He prescribed a dose of 4 mg of IV Morphine for HW's severe pain after the NSAID as Toradol IV didn't help, and 8 mg of Zofran for his vomiting. Dr. Felter's Addendum Notes, written after HW's death, stated that he had planned to **discharge** HW, (the **fifth** time HW would have been discharged from this CNMC ED at UMC within 12 days); however, HW "became faint on standing", so he ordered Labs (a CMP), which revealed elevated liver enzymes, for which a diagnosis of hepatitis was given.  However, once again, no social or sexual history was taken. As a matter of fact, no complete history of present illness including chief complaint and past medical history including social history and sexual history (preference) were taken.  These failures violated National standards of care.

While awaiting transport to the main campus for Direct admission, HW suffered the first of many subsequent episodes of seizure-like activity, described by Dr. Felter as a "sudden stiffening of entire body and tachycardia to 140." Dr. Felter also wrote that, during his sign-out to Dr. Sophia Smith that night, HW had "another sudden spasm of stiffening and complained of severe stabbing abdominal pain."  Morphine 4 mg IV was administered to HW for his severe pain at **21:18 on 10/3/14.**  This was the last time that **any** narcotic pain medication was given to HW for his pain over the ensuing **thirty hours and six minutes**, at which time HW was pronounced dead at 03:24 on 10/5/14. This violated National standards of care, causing extended and needless pain and suffering until HW died.

Had a thorough history been obtained, or had Dr. Felter determined who HW's primary care provider was and called him/her, Dr. Felter would and should have discovered that HW was MSM. These failures violated National standards of care,

Because of the abnormal tachycardia episodes on the night of 10/3/14, Dr. Felter ordered an EKG, performed at 23:12; it revealed a prolonged QTc interval of 476ms, as well as T wave abnormalities. Despite these abnormalities, there was never a follow up EKG performed on HW at all, ever, which violated National standards of care.

An HIV test was ordered by Dr. Sophia Smith on the night of 10/3/14, which returned positive; the resident at the main campus was reportedly notified of this.
HW arrived at the CNMC Main campus ED in the early morning hours of 10/4/14. Despite HW's positive HIV status, known as of the late night of 10/3/14, no Syphilis test was drawn until 18:15 on 10/4/14, which violated National standards of care.

HW was admitted to the floor of Children's Hospital, and he was put on a cardiac monitor. Despite HW continuing to complain of severe pain, he was only given the NSAID Toradol for the pain. His severe spasms and tachycardia continued. Dr. Sophia Smith testified at deposition that HW was screaming in pain.

It was assumed that HW's spasms were due to a psychiatric conversion disorder, for which HW was given the anti-anxiety drug Ativan 4 mg IV at 05:40 on 10/4/14. Ativan, however, is also first line medication for seizures. So, perhaps, a blessing in disguise, but really simple malpractice considering his pain.

In addition HW had been given a dose of Valium, 5 mg IV at 00:43 on 10/4/14; he was given an oral dose of 5 mg Valium at 16:30 on 10/4/14, for "spasm and agitation"; and he was given another dose of 5 mg oral Valium again at 20:45 on 10/4/14, for "pain", although Valium is not a pain medication.

On **10/5/14** at 02:31, one minute into HW's Code, an order was entered to give Ativan 2 mg IV at 02:32, "Once, PRN for anxiety."

On the floor, HW's care was assumed by Dr. Gabrina Latria Dixon. When it was mentioned that he might have had seizure like activity while awaiting transport after he had passed out in a syncopal like episode, no further differential diagnosis was considered at the receiving facility, despite HW's HIV positive status. This failure was a violation of National standards of care.

I don't know where Dr. Dixon was, but the assessment lacked critical medical decision making. This young man needed ICU care and he needed to be evaluated and treated properly the moment he arrived for his last visit October 3rd, 2014 as described above. Failure to do these things violated National standards of care.

Why would a healthy teenager have seizure like activity with headaches, severe abdominal pain and fevers for a period of over 11 days?

But even when given a patient like this to the floor, the attending physician must never stop thinking: What is the differential diagnosis? And the attending physician is obliged by the standard of care to assess the patient: **Chief Complaint, Past Medical History, Physical Examination, and Treatment Plan**.... It is the continuum of care... and one is as guilty as the other. Just because the ED did not do their job, does not free the hospitalist. We, the ED physicians are pediatricians first and ED physicians second. The same holds true for the hospitalist: pediatricians first, hospitalists second. These failures violated National standards of care.

The national standard of care required Dr. Dixon to respond to the positive result of HIV and broaden HW's differential diagnosis accordingly, now to her knowledge of his HIV, which meant that it needed to acute retroviral syndrome and he need to have been tested as soon as possible for other STDs to include Syphilis. All of these failures violated National standards of care.

Neurological involvement of Syphilis has been well known for many hundreds of years and is well described not only in the medical literature involving many famous people including philosophers like world-famous Friedrich Nietzsche. But it is general intellectual knowledge and should be known to a well-educated physician.

There was a helter-skelter approach by HW's treating CNMC providers during his presentation; nobody took charge of this young man's care, when his laboratory results, symptoms, their persistence and recurrence were quite forthcoming. Had anybody taken any interest in taking care of HW -- but in particular at his last chance, with Dr. Dixon, who should have been prompted to repeat lab tests and address known laboratory abnormalities, laboratory tests, it is likely HW would have been saved. The delays in diagnosis and the failure to treat HW's HIV and syphilis infections and sequela caused H.W. to become acidotic, hyperkalemic, hypoglycemic such that he could not be resuscitated when he suffered the cardiac arrhythmia.

These tests would have needed to include but were not limited to CBC with differential, CMP, CRP, ESR, liver enzymes, lactic acid, urine drug screen, blood culture, ELISA test (serum) for HIV, serum test for Syphilis and urinalysis with urine culture and forthwith to include performance of a lumbar puncture with opening pressure and full evaluation of the cerebrospinal fluid (CSF) including cell count, gram stain to include evaluation for Syphilis, glucose, protein and CSF culture immediately upon his arrival on the floor, or immediate treatment for presumed meningitis if she felt he was too unstable, with the differential diagnosis of Syphilis leptomeningitis and to transfer him to the pediatric intensive care unit to augment what had not already been done and to assume her duties as an attending physician in a timely fashion. This is what the National Standard of Care of a prudent and caring physician would have demanded. Where was she? At home?  H.W. was left in the hands of the least experienced physicians when he needed the life-saving care.  It is not even clear that anyone consulted the

HIV team for guidance.  The fact that these events occurred over the weekend is not an excuse for delayed care.

**Conclusions:**

In Washington, DC in 2014, was the epicenter of HIV infections, with highest prevalence among African American men having sex with other men. (MSM) When 17 year old H.W. presented to CNMC and UMC with symptoms of strep throat, pharyngitis, mono (kissing disease) and a viral syndrome, the National standard of care required CNMC ED Physicians to ask H.W. about his social and sexual history (preference) and to seek permission to draw blood to test H.W. for HIV to rule out early HIV.  CNMC ED providers were required to be aware of the high rates of HIV infection and syphilis infections in the U.S., Washington, DC and H.W.'s community given that he consented to blood draws and HIV testing by Dr. Smith, it is likely he would have consented. If he refused because of the recent HIV test at Unity, a focused sexual history would have revealed the history of unprotected sex with men and that only a finger stick test was performed.  This would have required CNMC ED doctor to call Unity and to perform serum HIV test to rule out acute HIV.

Defendant Unity Health Care Providers:

It is my opinion that the immense pain and suffering HW experienced during the weeks prior to his death, which continued during his final admission to CNMC, up until the time of his death, were proximately caused by the failure of the defendant Unity Healthcare providers to test HW for Syphilis and failure to timely diagnose and treat Syphilis and HIV.

Defendant Children's National Health Care:

The national standard of care required the CNMC ED physicians to do the following:
1.       Obtain pertinent history of present illness, past medical history and appropriate social and sexual history on HW during their evaluations and treatment of HW in the CNMC at UMC Emergency Department (ED) and CNMC hospital in 2013 and 2014;
2.       Perform appropriate physical examinations on HW during their evaluations and treatment of HW in the CNMC at UMC ED and hospital in 2013 and 2014;
3.       Reach appropriate and inclusive differential diagnoses; and as of 9/21/14 and beyond, include Acute Retroviral Syndrome, and initiate the appropriate investigation of such, in their Differential Diagnoses;
4.       On September 21 – October 4, 2014, the national standard of care further required the CNMC physicians to order laboratory tests to include but were not limited to CBC with differential, blood culture, CMP, CRP, ESR, liver enzymes, ELISA test (serum) for HIV, serum tests for Syphilis, lactic acid, urine drug screen, and urinalysis with urine culture.  On his visits of September 29th, 2014 and forthwith: to include performance of a lumbar puncture with

opening pressure and full evaluation of the cerebrospinal fluid (CSF) including cell count, gram stain to include evaluation for syphilis, glucose, protein and CSF culture;

5.      Ascertain, obtain and provide important medical information from and to HW's primary care providers in 2013 and again in 2014;

6.      Timely diagnose and timely treat HW's Acute Retroviral Syndrome (ARS); and

7.      Timely diagnose and timely treat HW's syphilis infection.


The failures by CNMC providers to do each of the above were each violations of national standards of care, and such violations were each a proximate cause of HW's ultimate Code and his eventual death. But for these violations of national standards of care, HW would more likely than not have survived his acute HIV infection and his syphilis infection. In my opinion, HW likely contracted Syphilis in 2013 given his presentation in March –August 2013, or in 2014 when he continued to have a history of MSM or when he reported the unprotected sex with 2 females.

Hospital protocols trigger certain automatisms in orders from non-physician staff (e.g. giving acetaminophen to febrile infants) before the physician sees a patient and hence save time and enable prompt timely treatment. In this particular case, oral HIV swabs were obtained on HW. While it is laudable for any institution, in particular a renowned institution like CNMC, to have protocols in place, it is also prudent for any physician to be knowledgeable of these protocols. Having hospital protocols in place does not free the physician or physician extender of the duty to engage in critical thinking and forming an appropriate differential diagnosis, and here in particular, pertinent to the presenting signs and symptoms, and ordering appropriate tests.

Given HW's symptomatology and here also in particular his headaches, with the differential diagnoses of pharyngitis and viral syndrome as early as of 9-21-2014, acute retroviral syndrome should have been in the differential diagnosis, especially in a tertiary pediatric medical center and teaching institution in an area of the city with known high rates of HIV. Washington D.C. was the epicenter of the HIV epidemic at this time per CDC and per even CNMC's own protocol entitled 'HIV Screening in the Emergency department'.

Given HW's symptoms, the differential diagnosis of acute HIV should have been considered as early as 9/21/2014, it was mandated as per the National Standard of Care and again the CNMC protocol that an ELISA (serum) test should have been performed.  This was the National Standard of Care for 9/21/2014, 9/23/2014, 9/29/2014, 9/30/2014 and 10/3/2014. Nowhere in the literature, even then, were oral swabs recommended for the detection of early HIV/ARS as they have the least probability of detecting early HIV positivity. All of these physicians involved in his care hence violated the standard of care by not ordering any HIV tests or syphilis testing before 10/3/2019 and then ordering the wrong HIV test but also by totally ignoring his social and sexual history. This is plain and simply thought lazy.

Ordering the right HIV test (ELISA) before October 3, 2014 would have been lifesaving to this young man as it would have led to the earlier diagnosis of HIV and   syphilis, which would have led to treatment of both diseases and likely saved his life.

On September 23, 2014, CNMC physician, Dr. Rucker, appropriately obtained the name of H.W.'s PCP, but this ED medical information was not communicated to H.W.'s PCP as was CNMC's practice. Dr. Rucker ordered a monospot test on this date. The mononuclear spot test or **monospot** test, a form of the heterophile antibody test, is a rapid test for infectious mononucleosis due to Epstein–Barr virus (EBV). Mono is referred to as the "kissing disease". Clearly, she was thinking of intimate contact as a cause of his symptoms. She was required to follow this thought to its logical conclusion, and consider other viral diseases caused by intimate contact that might explain his symptoms. The CDC noted in 2010 that "[h]ealth-care providers should be knowledgeable about acute HIV infection and the symptoms and signs of acute retroviral syndrome which develops in 50%–80% of acutely infected patients. Acute retroviral syndrome is characterized by nonspecific symptoms, including fever, malaise, lymphadenopathy, and skin rash. It frequently occurs in the first few weeks after HIV infection, before antibody test results become positive. Suspicion of acute retroviral syndrome should result in prompt nucleic acid testing (HIV plasma RNA) in addition to an HIV antibody test to detect the presence of HIV. A positive HIV nucleic acid test should be confirmed by subsequent antibody testing to document seroconversion." HW had all of these clinical findings and there was a rash present on his buttocks at autopsy.

By September 29, 2014, H.W.'s third ED visit, CNMC ED physicians were required to contact H.W.'s PCP because it is unusual for a 17-year-old to return to the ED three (3) times in nine (9) days with worsening complaints.  But the health care providers for Defendant CNMC failed to inquire about H.W.'s sex history and never contacted his primary health care provider – Unity Healthcare – at any time prior to his death -- to obtain medical history information about this African American adolescent male living in Washington, D.C., an area where HIV and Syphilis were increasing during 2013 and 2014, especially among males having sex with males ("MSM") and given him appropriate follow up. Had any of the ED physicians, during any of HW's visits to the CNMC ER in 2013 and 2014, taken the time to ask H.W. and call Defendant Unity Healthcare providers to gain medical history information about HW, they more likely than not would and should have been informed that HW was MSM, which he had freely and frequently disclosed to his health care providers at Unity for a year and seven months prior to his death. This crucial information would and should have prompted the CNMC defendants to order HIV and syphilis testing on HW, which would have diagnosed his HIV and syphilis and led to their successful treatment, preventing his death.

It is also my opinion that Defendant Children's National Medical Center  employees violated the National standard of care by failing in 2013 and 2014 to follow their own continuity of care policy, which was to send the CNMC physician's Clinical Discharge Summary -- including the patient' conditions, diagnoses, lab results, interventions and physicians' notes -- to the primary care provider.  Instead, Defendant CNMC never sent the Clinical ED notes to H.W.'s primary

care provider because CNMC had the wrong primary care provider listed for H.W.  When CNMC finally contacted the PCP they had incorrectly listed, after H.W.'s death, CNMC learned that H.W. was not his patient.  It is my opinion that even after being told, during the September 23, 2014 CNMC ED visit, that HW's primary health care providers were at Unity Healthcare, the defendant CNMC employees never ensured that such information was included in HW's chart so that his information would be sent to those Unity Healthcare providers.  This failure by CNMC precluded continuity of care and prevented Unity from having the information contained in the CNMC Clinical Discharge Summary when H.W. was seen at Unity after August 5, 2013 and on September 29, 2014.

Additionally, it is also my opinion that the CNMC providers negligently failed to call any Unity Clinic provider on September 21, 2014, September 23, 2014, September 29, 2014, September 30, 2014, October 3, 2014 or October 4, 2014 (when he was transferred to the main campus ER to be evaluated prior to being admitted) to discuss HW with his primary care providers. This represents six (6) total CNMC ER visits within 11 days, in an adolescent African American male who was becoming more acutely ill, with no valid diagnosis, yet not one phone call was made to his primary care provider. These were horrible omissions and egregious violations of National Standards of Care which delayed the diagnosis and treatment of HW's HIV and Syphilis, which were each a proximate cause of his eventual death.

All of the physicians involved in HW's care failed to assure that this young man received proper follow up care. While this might happen once by accident, certainly by the third time, especially with computers in place, follow through care should have been ascertained. Nowhere in the record is there a string of private medical care noted through a primary health care provider. Dr. Dawood, mentioned in the records, had nothing to do with his care.

The risk of having a simple blood test done for syphilis and HIV (early on not even an LP necessary) is miniscule: the pain of a little poke! Nothing in comparison to the benefit of the outcome! A positive test and early treatment! The failures by the Defendant CNMC providers to meet these standards of care resulted in HW's syphilis being undiagnosed and untreated, which, when combined with his subsequent acute HIV infection, led to his death.

It is clear from the CNMC documentation that the CNMC ED physicians failed to review prior ED visit information.  For example, there was never any follow up to be sure he was cleared of the August 5, 2013 UTI by Dr. Saidinjad when HW presented again in May 2014.  Additionally, on September 30, 2014 the doctors were not even aware that he had a fever since at least 9.21.2014, 9 days. He had been discharged the day prior with a diagnosis of *fever without a source*" and it was noted that he had had the fever for the past 3 days.

Why a complete screening, including Syphilis screening, when all the data were available, the history was available, including the past medical history, was not performed on HW, is incredible. Even let alone all the data, evidence-based literature – it is simple training that one receives in medical school!

The Defendant Unity Healthcare Center had the opportunity to follow up on all the ER visits. The Children's National Medical Center had the opportunity to compare all the previous visits and get a complete history of pertinent past events. Obtaining a thorough an appropriate history is standard of care nationally. In a teenager who is highly anxious with abdominal pain, one must always ask: "why"?

A sexual history is never to be taken with the parent in the room. Where is the privacy for the patient, their dignity? The health care provider must ask and also assure the adolescent patient that all sexual history information provided to them will be kept in strict confidence, and will not be divulged to the parent/guardian without the teen's explicit permission. This was obviously not done by the CNMC ED at UMC and main campus ED providers, since HW did share his MSM status repeatedly only with his Unity Healthcare providers. Obviously, he did not trust the CNMC providers. What did they do wrong?

Syphilis is treatable, curable and is highly sensitive to penicillin. HIV is also now treatable; those who acquire it are expected to live to their full life expectancy with the use of antiviral medication cocktails. HW's death was thus preventable. Delays in diagnosis and failure to treat HIV and syphilis infections caused H.W. to become acidotic, hyperkalemic, hypoglycemic such that he could not be resuscitated.

The extreme pain and suffering and anguish he underwent in the last few weeks of life, until his demise, was completely unnecessary and was caused by his undiagnosed and untreated Syphilis, combined with his subsequent acute HIV infection. HW's undergoing a 'psychiatric and psychological' evaluation via phone on October 4, 2014, because his providers **inaccurately** assumed his spasms were caused by him being told of his HIV positivity, was also negligent, causing pain which was inappropriately treated with mere anti-anxiety drugs for a supposed "conversion disorder", allegedly diagnosed by Dr. Dixon, but was just simply nothing but a lack of critical decision making and thought. One can only begin to imagine what it must feel like, the emotional pain it might cause, to be told that one is 'crazy' when one is actually having a physical manifestation of infection in the brain and body, and about to die secondary to meningitis. This was a breach of the standard of care and contributed to his ultimate demise.

I have also come to the conclusion that the immense pain and suffering HW experienced during the weeks prior to his death, which continued during his admission to CNMC, up until his death, were each a proximate cause and result of the failures of the defendant CNMC Health care providers and his Unity Healthcare providers to consider, timely test for, diagnose and treat his Syphilis and his later acute HIV infection. All of this prevented HW from having a future, having an income and leading a prosperous life, letting alone the pain and suffering it caused him and his family. We are not to bury our children; they are to bury us.

I hold each of my opinions stated above to a reasonable degree of medical probability.

I have come to the above conclusions, formed my opinions and I am providing you with my written statement. From March of 2016 to date, I have spent about 22.5 hours of my time on this case and have earned a fee of approximately $8437.50 which includes an extensive amount of time spent preparing this report.

Respectfully submitted,

*Julia Whitefield MD.*

Julia S. Whitefield MD, Ph.D.
Pediatric Emergency Medicine

**List of Providers/Depositions:**

1. Abayomi Jones, MD 10/6/10 Unity Health Care
2. Andre Douglas, NP 7/23/12 Unity Health Care
3. Aima Payton, NP Various Dates from 8/14/12 to 9/12/14 Unity Health Care
4. Fareed Reza Saleh, MD 4/2/13 CNMC ED Physician
5. Alicia Baker, NP 9/19/14 Unity Health Care NP at 9/19/14 Health Care Clinic Visit
6. James Martin, MD  9/21/14 CNMC ED Physician
7. Eiman Abdulrahman, MD  9/21/14 CNMC ED Physician
8. Sephora Morrison, MD  9/23/14 CNMC ED Physician
9. Alexandra Cheri Rucker, MD 9/23/14 CNMC ED Physician
10. Mohsen Saidinejad, MD 9/29/14 CNMC ED Physician
11. Joanna Cohen, MD 9/30/14 CNMC ED Physician
12. Rajesh Kirit Daftary, MD 9/30/14 CNMC ED Physician
13. Robert Felter, MD 10/3/14 CNMC ED Physician
14. Shantielle Thomas 10/3/14 D.C. Fire and EMS Ambulance Transport to CNMC
15. Erin Augustine, MD 10/3/14 CNMC ED Physician
16. Gabrina Dixon, MD 10/4/14 through 10/6/14 CNMC Attending Hospitalist
17. Rachelle El Helou, MD 10/4/2014 CNMC Peds Resident and Receiving Physician
18. Gillian Abrams, MD 10/4/14 CNMC Peds Resident
19. Sophia Smith 8/5/13; 5/17/14; 10/4/14 CNMC Physician during 10/4/14 admission
20. Angela Wratney, MD 10/5/14 CNMC PICU Attending during 10/4/14 admission
21. Kathy Ferrer, MD  10/4/14 CNMC Consultant team
22. Meredith (Graves) Gibson, RN 10/4/14 CNMC
23. Joanna Tylka, MD 10/5/2014 CNMC Peds Critical Care Fellow 'Code Blue' responder

**Julia Sabine Whitefield, MD, Ph.D.**
**Curriculum Vitae**

**Date**
August 14th, 2018

**Name and Terminal Degree(s)**
Julia Sabine Whitefield, MD, Ph.D.

**Permanent Address**
13204 Desert Star Road NE
Albuquerque, NM 87111

**Work/Business Address**
5525 N. Stanton Street Apt. 26A
El Paso, TX 79912

juliawhitefield@msn.com
505.414.8768 (c)
915.600.5610 (f)

**Licensure(s) with Date(s)**
| | |
|---|---|
| December 2015 | Texas License Q6721 (current) |
| February 2007 | New Mexico License # MD2007-0050 (current) |
| June 2002 | Tennessee License #36519 (expired) |
| March 2001 | Indiana State License # 01053747A |
| | CSR 01053747B (expired) |
| October 1985 | Colorado State License #27188 (current) |
| | DEA License #BW0778590 (current) |

**Certification(s) with Date(s)**
*Pediatric and Pediatric Emergency Medicine Certifications:*
| | |
|---|---|
| through March 2027 | Recertification American Board of Pediatrics (Maintenance of Certificate (MOC)) and American Board of Pediatrics Sub-board of Pediatric Emergency Medicine |
| March 2017 | ATLS re-certified |
| August 2016 | BLS, PALS, ACLS re-certified |
| December 2006 | American Board of Pediatrics Re-certification |
| October 2006 | Recertification American Board of Pediatric Emergency Medicine |
| March 1994 – present | PALS Affiliate National Faculty |
| November 1998 | Certification American Board of Pediatric Emergency Medicine |
| March 1996 and 2003 | Re-certification American Board of Pediatrics |
| April 1993 to 2000 | PALS Course Director |
| October 1989 | Pediatric Board Examination |
| | Diplomat of the American Board of Pediatrics |
| July 1985 | FLEX |
| November 1983 | Education Commission on Foreign Medical Graduates (ECFMG) |

**Educational History:**
Resident (Pediatric Level 3)
July 1986 – June 1987
University of Colorado
Denver, Colorado

1

Resident (Pediatric Level 2)
July 1985 – June 1986
University of Colorado
Denver, Colorado

Internship (Pediatric Level 1)
July 1984 – June 1985
University of Colorado
Denver, Colorado

Assistant in burn research
January – February 1984
University of Colorado
Denver, Colorado

Intern in Emergency Medicine
February – June 1984
University of Colorado
Denver, Colorado

Ph.D.
December 1983
Johannes Gutenberg Universität
Mainz, Germany

M.D. (Approbation)
November 1983
Johannes Gutenberg Universität
Mainz, Germany

Senior medical year (sub internship)
August 1982- June 1983
University of Colorado Health Sciences Center (and its affiliated hospitals)
Denver, Colorado

Undergraduate studies are included in the 6-year program of most European medical schools
April/1976 - March/1983
Johannes Gutenberg Universität
Mainz, Germany

**Employment History**

Attending Physician
Children's Providence Memorial Hospital
Pediatric Emergency Department
El Paso, Texas
November 2015 through current

Appointment to Assistant Professor
July 2007 to July 2015
University of New Mexico
Albuquerque, New Mexico

Assistant Medical Director
Lifeguard Aero-medical Transport
November 2012 – May 2014
University of New Mexico
Albuquerque, NM

Attending Physician
July 2007 to July 2015
Emergency Medicine Department, Division of Pediatric Emergency Medicine
University of New Mexico
Albuquerque, New Mexico

Appointment to Clinical Assistant Professor
July 2003 - June 2007
Erlanger Campus, College of Medicine
University of Tennessee
Chattanooga, Tennessee

Attending Physician
July 2002- June 2007
T.C. Thompson Children's Hospital Emergency Department
Erlanger Campus, College of Medicine
University of Tennessee
Chattanooga, Tennessee

Founder, Medical Legal Expert and Consultant
April 1994 – Present
'Pediatric Community Services' instituting pediatric service lines (pediatric programs) and pediatric emergency departments throughout the country

Medical Director and Attending Physician
September 2000 – June 2002
Pediatric Emergency Medicine Dept. and Pediatric Urgent Care Center
St. Vincent Children's Hospital of Indiana
Indianapolis, Indiana

Contract Physician
July 1987 – June 2000
Pediatric Emergency Medicine, Regional Healthcare Network
The Children's Hospital
Denver, Colorado
Medical Director for half of the pediatric emergency medicine after hours program with 75% of my time spent in clinical work.

3

**Julia Sabine Whitefield, MD, PhD**
**Curriculum Vitae**

Clinical Assistant Professor
September 1992 – June 2000
University of Colorado Health Sciences Center
Denver, Colorado

Ski Patrol Physician
October 1994 – April 1999
Copper Mountain
Copper Mountain, Colorado

Medical Director
May 1997 – June 2000
Pediatric After-Hours Clinic, Aurora Urgent Care Center
The Children's Hospital
University of Colorado
Denver, Colorado

Medical Director
July 1991 - June 2000
Pediatric After-hours Clinic at Lutheran Medical Center
Wheat Ridge, Colorado
The Children's Hospital
University of Colorado
Denver, Colorado

Medical Director
July 1994 - June 1995
Pediatric After-Hours Program at St. Anthony Hospital North
Westminster, Colorado
The Children's Hospital
University of Colorado
Denver, Colorado

Chairperson
July 1992 – June 1994
Department of Pediatrics
Aurora Presbyterian Hospital
Aurora, Colorado

Physician Manager and Medical Director
July 1989 – June 1992
Community Hospital-Based Pediatric Program for The Children's Hospital
Aurora Presbyterian Hospital
Aurora, Colorado
The Children's Hospital
University of Colorado
Denver, Colorado

Medical Director
July 1989 – June 1991
Community Hospital-Based Pediatric Program for The Children's Hospital

4

St. Anthony Hospital North
Westminster, Colorado
The Children's Hospital
University of Colorado
Denver, Colorado

Attending Physician
August 1987 – June 1998
The Children's Hospital at St. Anthony North
Westminster, Colorado
Seeing pediatric emergency cases, ward admissions, pediatric consultant for the community
physicians, emergency "neonatologist" for high risk deliveries

Contract Physician (Part-time)
July 1987 – June 1988
Denver General Hospital
Denver, Colorado
Attend to the pediatric clinic and pediatric emergency cases in the main ED, covering 25% of evening
hours and weekends

Locum Tenens
July 1987 – June 1991
Denver metropolitan area for numerous private offices, supervising and teaching school nurse
practitioners in the summer
University of Colorado
Denver, Colorado

**Professional recognition, honors, etc.**

Invitation to Presentation in China 2014 to be a global speaker regarding Pediatrics
October 2014

Presentation of Research: Can Standard Criteria predict abnormal ECGs in Pediatric Patients in
Emergency Department Settings?
1st Global Pediatric Conference, Dalian, China, October 2013

Acceptance and Presentation of Abstract/Poster: Can Standard Criteria predict abnormal ECGs in
Pediatric Patients in Emergency Department Settings?
Pediatric Academic Societies Annual Meeting in Boston, MA April/March 2012

Presentation of Publication: 12 year old girl with sudden onset of numbness and tingling feet.'
EPS Montreal International Emergency Medicine Forum
June 2011
Montreal, Canada

100 Best Physicians in Albuquerque Metro Area (after having been in Albuquerque for 18 months only)
March 2009
Albuquerque News
Albuquerque, New Mexico

Excellence in Teaching Award

5

**Julia Sabine Whitefield, MD, PhD**
**Curriculum Vitae**

2001
University of Colorado Health Sciences, The Children's Hospital Center
Denver, Colorado

Employee of the Month
1999
Copper Mountain
Copper Mountain, Colorado

Host of the Year, 1999
Award for 2nd best achieved medical responder
Copper Mountain
Copper Mountain, Colorado

Host of the Year, 1998
Award for best achieved medical responder (>66% of votes for teaching, availability skill)
Copper Mountain
Copper Mountain, Colorado

Host of the Year, 1997
Award for best achieved medical responder (>66% of votes for teaching, availability skill)
Copper Mountain, Colorado

Host of the Year, 1996
Award for best achieved medical responder (>66% of votes for teaching, availability skill)
Copper Mountain
Copper Mountain, Colorado

Volunteer of the Month
January 1997
Peck Elementary School
Arvada, Colorado

**Memberships in Professional Societies**
Fellow of American Academy of Pediatrics
Fellow of American Academy of Pediatrics, Texas Chapter, Section of Pediatric Emergency Medicine

**Lectures**

**At UNM**
| | |
|---|---|
| 11/13/2013 | Tricyclic Antidepressants and their Overdose Pattern in Pediatrics – Lifeguard Air Ambulance Services: Presentation and QI |
| 09/11/2013 | Pediatric Head Trauma- EM lecture series |
| 09/04/2013 | M&M EM residents |
| 06/28/2013 | NAT – to new EM interns with Dr. Leslie Strickler |
| 06/20/2013 | Pediatric Head Trauma – Peds EM Series |
| 05/08/2013 | Peds Series |
| 03/26/2013 | EMS Academy: Pediatric Medical Emergencies |
| 03/26/2013 | EMS Academy: Pediatric Heme/Onc Emergencies |
| 03/06/2013 | Practice of Intubations with ET tubes and LMA - Lifeguard |
| 02/13/2013 | Lecture to Lifeguard Crew – Pediatric RSI |

6

| | |
|---|---|
| 02/13/2013 | Lecture to EM residents: Pediatric Neurologic Emergencies |
| 01/09/2013 | PEM Fellows' education: GI Emergencies and Legal Aspects |
| | |
| 11/07/2012 | PEM Fellows' education: Endocrine and Metabolic Emergencies: DKA |
| 07/11/2012 | Lifeguard: Pediatric Medical Emergencies – the approach |
| 06/28/2012 | Moderator of Lecture with Child Abuse Team: "Child Abuse" |
| 06/13/2012 | Lecture to EM residents: 18 month-old female with cough and fever x 5 months |
| 06/05/2012 | Journal Club at my house: Evidence Based Medicine |
| 05/09/2012 | EM lecture by our PEM fellow which I mentored and attended: Pediatric Hematologic Emergencies |
| 04/19/2012 | Phase II Pediatric Assessment, Station: Mock Code, Medical Students |
| | |
| 07/05/2011 | Moderator of Lecture with Child Abuse Team: "Child Abuse" |
| 04/21/2011 | Phase II Pediatric Assessment, Station: Respiratory Distress, Medical Students |
| 04/20/2011 | Phase II Pediatric Assessment, Station: Mock Code, Medical Students |
| 02/22/2011 | EM Resident Pediatric Lecture Series, Child Abuse |
| 01/18/2011 | EM Resident Pediatric Lecture Series, Medical Legal Issues |
| | |
| 04/21/2010 | Phase II Pediatric Assessment, Station: Respiratory Distress, Medical Students |
| 04/20/2010 | Phase II Pediatric Assessment, Station: Mock Code, Medical Students |
| 06/02/2010 | Journal Club: The accuracy of taking temperatures |
| 05/25/2010 | EM Resident Pediatric Lecture Series, URI/ Airway |
| 04/22/2010 | Phase II Pediatric Assessment, Mock Code, Medical Students |
| 04/22/2010 | Pediatric Residents |
| 04/21/2010 | Phase II Pediatric Assessment, Respiratory Distress, Medical Students |
| 03/25/2010 | Pediatric Residents |
| 02/25/2010 | Pediatric Residents |
| 02/16/2010 | EM Resident Pediatric Lecture Series, Cases |
| | |
| 12/22/2009 | EM Resident, Pediatric Lecture Series, Cases |
| 12/15/2009 | EM Resident Pediatric, Lecture Series, Ortho |
| 10/20/2009 | EM Resident Pediatric Lecture Series, Neurology |
| 09/24/2009 | EM Resident Pediatric Lecture Series, Cases |
| 08/27/2009 | Pediatric Residents |
| 08/18/2009 | EM Residents Pediatric Lecture Series, Legal Issues |
| 04/24/2009 | Pediatric Morning Report Noon Conference |
| 04/21/2009 | EM Resident Pediatric Lecture Series, Hematology/Oncology |
| 03/27/2009 | Pediatric Morning Report |
| 01/20/2009 | EM Resident Pediatric Lecture Series, Respiratory, Noon Conference |
| 12/23/2008 | EM Resident Pediatric Lecture Series, URI/Airway |
| 08/29/2008 | Pediatric Morning Report, Noon Conference |
| 06/27/2008 | Morning Report |
| 06/27/2008 | Noon Conference |
| 05/27/2008 | EM Residents Pediatric Case Presentation |
| 05/07/2008 | EM Student Rounds |
| 04/12/2008 | Phase II Pediatric Assessment Lecture |
| 04/12/2008 | Use of Intra-osseous Needles – Skills Station |
| 03/25/2008 | EM Residents, Pediatric Case Presentation |
| 03/12/2008 | EM Student Rounds |
| 10/24/2007 | EM Student Rounds |
| 09/06/2007 | PEM Conference |

7

Julia Sabine Whitefield, MD, PhD
**Curriculum Vitae**

08/29/2007        EM Student Rounds

**Invited lectures**

July 2017
1. A Life's Journey through Pediatric Emergency Cases
2. Pediatric Case Studies: What not to miss and How not to miss
National Nurse Practitioner Symposium, Keystone, Colorado

June 2017
Air Methods Presents – All Pediatric Conference
Key Cases of Trauma and Medical Pediatric Emergencies
EMS Conference, Alamogordo, New Mexico

September 2015
Journey Through Pediatric Emergency, Lessons learned
Enchanted Circle: EMS Conference, Red River, New Mexico

September 2014
Enchanted Circle: EMS Conference, Red River, New Mexico
Childhood Obesity
Pediatric Mental Health Issues

October 2013
Dalian, China
First World Pediatric Conference
Presentation of my ECG research

September 2013
Enchanted Circle: EMS Conference, Red River, New Mexico
Pediatric Trauma, Principles and Focus on Neurological Trauma (Head trauma)

May 2013
Lake Heron May TA Clinic Conference: EMS Lecture Series: Pediatric Trauma and Pediatric Medical
Emergencies

September 2012
Enchanted Circle: EMS Conference 'We're All We've Got', Red River, New Mexico
1. Principles of Pediatric (Multi)-Trauma
2. Principles of Fluid Resuscitation in Pediatrics

April/May 2012
PAS – Pediatric Academic Societies, Annual Meeting in Boston, MD
Poster presentation of my research: "Can Standard Criteria Predict Abnormal ECGs in Pediatric
Patients in Emergency Department Settings?"

October 2011
Enchanted Circle: EMS 'Nine in the Pines', Red River, New Mexico
"Fever and Different Types of Pediatric Shock"

8

**Curriculum Vitae**

June 2011
EPS Montreal International Emergency Medicine Forum
Presentation of my Publication: '12 year old girl with sudden onset of numbness and tingling feet.'
Montreal, Canada

September 2010
Enchanted Circle: EMS 'Nine in the Pines', Red River, New Mexico
"Respiratory Emergencies (Bronchiolitis)
"Pediatric Airway and Ventilation Workshop"

August 2010
Critical Care Transport Class, EMS Academy, Albuquerque, NM
"Pediatric Trauma, the difference between adults and pediatric patients"

August 2010
30th New Mexico Statewide EMS Conference Isleta Casino, New Mexico
"Assessment of Pediatric Trauma"
"Pediatric Respiratory Emergencies"

May 2010
Lake Heron May TA Clinic Conference: EMS Lecture Series
"Assessment of Pediatric Trauma"
"Pediatric Respiratory Emergencies"

April 2010
EMS Refresher, EMS Academy, Albuquerque, NM
"Depression and Suicidal Ideation in Adolescents"

September 2009
EMS Training, Enchanted Circle EMS, Red River, NM
 "Pediatric Medical Emergencies",
"Pediatric Trauma Emergencies and Child Abuse"

July 2009
"Pediatric Trauma Patterns with cases including Child Abuse"
"Pediatric Medical Emergency Cases and their Physiologic Background"
National Nurse Practitioner Symposium
University of Colorado
Denver, Colorado

September 2008
EMS Training
"Pediatric Medical and Traumatic Emergencies"
Enchanted Circle EMS
Red River, NM

June 2008
PA/Nurse/Physician Training
"Preparing the Medical Home"
Guadalupe County Hospital
Santa Rosa, NM

Julia Sabine Whitefield, MD, PhD
**Curriculum Vitae**

November 2007
EMS Training
"Pediatric Trauma Patterns"
Taos Ski Valley
Taos Ski Valley Ski Patrol
Taos, New Mexico

2003, 2004, 2005, 2006 (and even years prior through 1998)
Pediatric Medical and Traumatic Emergencies
National Nurse Practitioner Symposium
University of Colorado
Keystone, Colorado

September 2004
Pediatric Emergency Medicine Lecture Series
Pediatric Trauma Patterns
University of Tennessee
Vanderbilt University
Nashville, Tennessee

April and May 1999
Triage, Assessment and Diagnosis of Commonly Encountered Pediatric Problems
Allina Health System
United Hospital, St. Paul, Minnesota
Peace Center, Hutchinson, Minnesota

**Community Service/ Other UNM related service**
2007 – current
Training of EMS & Lifeguard (as above)

2008 – current
Adult Teaching Model: Flight Staff as Physician Extenders
Training our Flight Crew from Lifeguard with us, as physicians. First time in the US
UNM HSC Lifeguard
Albuquerque, New Mexico

**Short narrative description of research, teaching and service interests.**

All of my professional life I have devoted to teaching communities on how to deal with pediatric emergencies. I have done this in community hospitals for The Children's Hospital in Denver, St. Vincent Hospital in Indianapolis, T.C. Thompson Children's Hospital. I am most proud of instituting the first Pediatric Emergency Department at St. Vincent Hospital, the first of its kind in Indiana. Since I believe so strongly in the presence of Children's Emergency Medicine Departments, I was able to raise $1.2 Mio in Indiana for the Pediatric ED and thousands of dollars for my project Aurora Urgent Care Center through Children's Hospital in Denver.

In Denver, we practiced an extension of the care of a tertiary care, regional trauma center within the community of the patients. Since I lived within the community I wanted to educate patients and parents. I initiated Saturday classes for parents/patient with asthma. We taught families about asthma care, dispensed inhalers and showed them the effect on their child's care in using a nebulizer.

10

I instituted training for pre-hospital providers and Flight For Life, Denver, Colorado, the oldest air medical service (air ambulance as called by some) in the US. I repeated the same for Life Force, Chattanooga, TN, as part of the University of Tennessee, Erlanger Campus, and have continued doing so here with Lifeguard. I am still volunteering my time not only for training but also review of standards of care, protocols including respiratory distress in particular in asthma care, fever, sepsis and pediatric trauma cases. All of this stems from my clinical interests which I expanded to Copper Mountain Ski Patrol, Copper Mountain, Colorado, where I functioned as a pre-hospital provider in addition to learning basis skills in ski patrolling, so I would be able to help evacuate patients and stabilize them. I was the only medical provider able and trained in handling snow sleds with patients loaded. I reviewed protocols and updated them, volunteered for annual training sessions (lectures) and was voted for as best medical provider 3/5 years in a row. The 4th year I became employee of the month for all of Copper Mountain.

It is my academic interest in patient care improvement that prompted me to look at the appropriateness of ECGs obtained in our pediatric population, more often than not done inappropriately. This is a new study within the US and is in the process of publication after presentation at the Pediatric Academic Societies Meeting in Boston, MA in May 2012. I was fortunate enough to not only have the study approved rapidly, but also was allotted a $10,000 grant to complete my work. Along the same line, always thinking about how to better pediatric care within the community I practice out of, I proposed to utilize a 'C-arm'. It is a mobile radiology machine used in particular in setting fractures – adults and children alike. It increases completion of patient care in a more timely fashion, decreases the amount of unnecessary X-rays to patients and in the end decreases suffering for our patient clientele by making reduction procedures more efficient.

In the little over 8 years that I have been at UNM, I also initiated quality improvement for ECGs teaching my colleagues and supervisors about appropriateness of ECGs in the pediatric population through my proposal for general quality improvement parameters within our division. This is an ongoing work in progress, now getting some national attention after the presentation of our poster and abstract at the Pediatric Academic Societies Meeting in Boston, MA in May 2012. This study has never been done before and I already initiated contacts at the PAS meeting to institute a study as a multicenter approach amongst at least 30,000 patients. Lastly in the little over 5 years that I have been here, I also involved myself in the laboratory process of completing and adding tests. My latest effort pertains to the appropriateness of treatment in and updating our protocol for the treatment of Diabetic Ketoacidosis, involving our three pediatric emergency medicine fellows and the nationally renowned Barbara Davis Center in Denver, Colorado. It is also a work in progress and should augment the range of quick and necessary tests in particular for the pediatric emergency medicine clientele.

In summary, my life has been devoted to teaching and training parents, nurses, paramedics, EMTs and colleagues. Since I have mainly worked in clinical positions and am now well into the second half of my career, I have arrived at the point in my professional life, where I feel it necessary to share my experience by continuing to teach, improving care further at UNM for our patients and by publishing this experience. I see my future career here as decreasing my clinical duties slowly over the next years to come so I can do more research, write about it, share my experience and teach even more.

11

**Julia Sabine Whitefield, MD, PhD**
**Curriculum Vitae**

**Scholarly achievements**

Martin Couney's Story Revisited. Letter to Editor The AAP Perinatal Section Ad Hoc Committee on Perinatal History: L. Joseph Butterfield, MD, Chair. _Pediatrics_ 100(1):159-160 July 1997 Reproduced by permission of _Pediatrics_.  Julia Whitefield, MD, PhD, from Frankfurt, then living in Arvada, CO, translated a paragraph from the "Official Exhibition News" of 1896.

Member of the Neonatology Historical Section (1994-1998) of the American Academy of Pediatrics. Liaison between them (sponsored by Dr. Joseph Butterfield) and the Historical Section of the Pediatric Society in Germany (Prof. Dr.med. Eduard Seidler). Participated in finding Jewish pediatricians and/or their relatives in the USA after fleeing from Germany during the WWII. Actively participated in finding a pediatrician in Denver (Dr. Alfred Japha) and hence augmented and participated in the data gathering for Professor Seidler's Book: Jüdische Kinderärzte 1933-1945: Entrechtet, geflohen, ermordet. Jewish Pediatricians 1933-1945, Victims of Persecution.

Cited for my work in the above

Participated in the International Meeting of both the German Pediatric Society and American Academy of Pediatrics in Vienna, 1997, for above reason.

**Original research or scholarly articles in refereed journals:**

Barber, GA, Whitefield, JS: "Cultivated Child Abuse: A 2 year old with Hyponatremic Seizures". Pediatric Emergency Care. 28(11):1234-1235, November 2012. doi: 10.1097/PEC.0b013e318272089d

Whitefield JS, Greene A, Schrader R, Tennison M, Sandoval M: Predictability of Abnormal ECGs in the Pediatric Population, Abstract accepted and published and by Pediatric Academic Society (PAS) February, 2012 and presented at PAS meeting sponsored by the American Academy of Pediatrics (AAP) in May 2012.

Whitefield, J. Case Challenges: Radiology: A 12-year-old Girl with sudden Onset of Numbness and Tingling of her Feet, Pediatric Annals, Volume 39, 5, May 2010, pp. 271-273

Kempe A., Dempsey C., Whitefield J., Bothner J., MackenzieT., Poole S.  Appropriateness of Urgent Referrals by Nurses at a Hospital-Based Pediatric Call Center.  Arch Ped. Adol. Med. Vol 154, pp. 355-360. April 2000.

Bender EM, Hansbrough JF, Whitefield J, Anderson J, Claman HN.  Prevention of Postburn Alterations in Helper and Suppressor T-Lymphocytes by Cimetidine.  Surgical Forum 35:156-7, 1984.

**Other writings and scholarly products** (not abstracts) **and writings pending**

Whitefield JS, Greene A, Schrader R, Reddy D, Tennison M, Sandoval M: Can Standard Criteria predict abnormal ECGs in Pediatric Patients in Emergency Department Settings? To be submitted to Pediatrics, May 2015

Rood, CJ, Whitefield JS, Hayek R: A 10-year-old Boy with Fever, Sudden Onset of Lower Back Pain, and Gait Change. Submitted and Accepted to Pediatric Annals November 2012, published in June 2014

12

Whitefield, JS, Atler, L: A Model for Adult Learning and Teaching: Flight Staff as Physician Extenders. Work in progress (07/2011)

Whitefield, J. Anchors Aweigh: Tips for cruising into a safe summer. Erlanger Health Magazine, Chattanooga, TN, Summer 2004

Citation in Chattanooga News regarding ATV accidents and head trauma Summer 1994

Numerous Citations regarding first Pediatric Emergency Department in Indianapolis, Indiana 'Indianapolis Star' 2001

Whitefield J. Case of the Month: Dehydration and Hypovolemic Shock - Evaluation and Treatment. Lutheran Medical Center monthly publication 'Rounds', March 1996.

Whitefield, J. Commentary on 'The Pediatric Health Care System'. MD News. Atlanta Georgia, January 1996.

Whitefield. J. Numerous citations in the TCH News regarding accomplishments at Aurora Urgent Care Center and Lutheran Medical Center: 1992, 1997, 1998, 1999.

Editor for Schmitt, Barton: Pediatric Advisor, 1990

Whitefield, J., Clein, M. Genesis, an educational videotape on child neuromotor development. Published in spring, 1987.

13

Julia Sabine Whitefield, MD, Ph.D.
**Curriculum Vitae**

**Current Grant and Contract Funding:**
Project Title:              "Predictability of Abnormal ECGs in the Pediatric Population"
Principal investigator(s):  Julia Whitefield, MD, Ph.D.
Percent effort:             N/A
Funding organization:       CTSC/ECHO Clinical Investigators Program
Start & Stop Dates:         May 1, 2009 – May 30th, 2013
Amount awarded:             $10,000

Julia Sabine Whitefield, MD, Ph.D.
**Curriculum Vitae**

**Teaching / Education**

**Undergraduate medical student mentoring**

Shawna Tsoodle MS II
September-October 2014

Jacob Mayfield MS II
September-October 2014

Charlton Lindsay MS I
2-4-2014- Completed

Andrew Doering MSIV
2-5-2013- Completed

Adam Ulibarri MS I
2013 - Completed

Kate Doggett MS II
09 to12-2012- Completed

Amjad Musleh
2012- Completed

Kylee Greider
Premedical Student
2012-Completed

Natalie Nieto
Premedical Student
2010-Current

Sara Tuzel, premedical student (mentoring, shadowing)
2009-Current

David Rodriguez (6 clinical rotations) 2012
MS I
Completed

Miguel Sandoval MS III (research)
Completed
Medical Student

William McClellan MS II (clinical, 4 rotations)
Completed

David Freedman MS III (clinical, 2 rotations)
Completed

15

Maria Montoya MS III (clinical, 1 rotation)
Completed

Alysha Gallegos, premedical student (mentoring, shadowing)
10/2009

Natalie Weiss – high school student, mentoring (40 hours)

Natalie Johannes - premedical student (mentoring, shadowing)
2012

Matthew Sanchez - premedical student (mentoring, shadowing)
2012

Preceptor, Continuity Clinic preceptorship program, and medical student research mentor, UNM SOM.
Current

Classroom laboratory teaching, and tutoring (courses or blocks taught or team-taught)
Phase I interns
Phase II Medical Students

**Resident and fellow teaching and mentoring**

Pediatric Fellows: Raelene McKeon, Ramsey Tate, Melody Kinsley and Natasha James
Updating DKA protocol and ongoing training on various subjects,
Pediatric Abdominal Emergencies including legal aspects
Teaching and Mentoring
July 2012 – 2013

Deepthi Reddy, Resident
July 2012 – Current
Publication, NIH Grant Fund Writing and Mentoring

Matt Tennison, former Resident
January 2009- Current 2012 (>40 hrs)
Research - Completed

Gary Barber, Resident
October 2010 – Completed
Publication, Research and Mentoring

Corey Rood, Resident
October 2011 – July 2013
Publication, Research and Mentoring

**Continuing Medical Education (please see attached file)**

December 2010 to current
American Board of Pediatrics
Recertification (>100 hours)

July 2009 through June 2011
All of my lectures including Enchanted Circle EMS
(>40 hours)

December 2006
American Board of Pediatrics
Recertification (>40 hours)

September 1998
American Academy of Pediatrics
Intensive Prep Emergency Medicine Course
La Jolla, California (44 credit hours)
July 1987- June 1999
Department of Pediatrics
The Children's Hospital
Denver, Colorado,
University of Colorado (1 credit hour per month (>80% attended)]

July 1991- June 1999
Department of Pediatrics Section meetings
Lutheran Medical Center
Wheat Ridge, Colorado (10 credit hours per year)

September 1989
Louisiana Pediatric Board Review
New Orleans, Louisiana (65 credit hours)

August 1992
35th Annual Pediatric Program
Aspen, Colorado (12 credit hours)

17

**Curriculum development or educational administrative positions**

December 2010
Medical Director PALS
CDM, Albuquerque, NM

1995-current
Teaching pediatric assessment and pediatric emergencies
Nurse Practitioner Program
University of Colorado Health Sciences Center (UCHSC)
Denver, Colorado

December 1995
Instructor
Grand Rounds at Provenant St. Anthony Hospital Central
Denver, Colorado

October 1994- April 1999
Teaching pre-hospital providers
Copper Mountain, Colorado

July 1992- June 1994
Organizer, Creator, Medical Director
Department of Pediatrics at Aurora Presbyterian Hospital
Aurora, Colorado

May 1992
ACLS Instructor
Taught the Pediatrics section
Aurora Presbyterian Hospital
Aurora, Colorado

July 1990 - June 1999
Instructor
Emergency Medicine Technicians on procedures
Children's Hospital
University of Colorado
Denver, Colorado

July 1989 - June 1998
Organizer, Co-Creator, Medical Director
Community Hospital-Based Pediatric Program
The Children's Hospital St. Anthony North
Westminster, Colorado

July 1987- June 2000
Lecturer
To Ancillary staffing at Aurora Presbyterian Hospital, Aurora Urgent Care Center, Lutheran Medical Center, and St. Anthony's Hospital North
Denver, Colorado

18

July 1993 – June 2000
PALS Course Director
Lutheran Medical Center (yearly to bi-annually with excellent reviews)
Wheat Ridge, Colorado

July 1987 – June 2000
Continued Medical Education for physicians at Community Hospital based Pediatric Program
Children's Hospital and Emergency Department, Lutheran Medical Center, Aurora Urgent Care, Aurora
Presbyterian Hospital, St. Anthony Hospital North, St. Vincent Hospital
Denver Metropolitan Area
Denver, Colorado and
Indianapolis, Indiana

**Service**

**Present patient care activities**

Attending Physician
Tenet Health Providence Memorial Hospital
Pediatric Emergency Department
November 2015 to current
El Paso, Texas

Attending Physician
Tenet Health Providence Memorial Hospital
Committee on Disaster Preparedness
Current
El Paso, Texas

Attending Physician
July 2007 – July 2015
Division of Pediatric Emergency Medicine
Department of Emergency Medicine
School of Medicine
University of New Mexico
Albuquerque, New Mexico

Institution of Pediatric Protocols at Lifeguard
Lifeguard Air Ambulance Service
Department of Emergency Medicine
University of New Mexico

BabyPod II, Institution and Approval of use to replace Isolette
Quality of Service, current
Lifeguard Air Ambulance Service
Department of Emergency Medicine
University of New Mexico

C-ARM, Quality of Service
January 2008 - current
Department of Emergency Medicine
University of New Mexico HSC
Albuquerque, New Mexico

**Past patient care activities**
ECG QI, Quality of Care
September 2007 - 2011
Pediatric Emergency Medicine, Department of Emergency Medicine
University of New Mexico HSC
Albuquerque, New Mexico

July 2002 – June 2007
Attending Physician
T.C. Thompson Children's Hospital

Julia Sabine Whitefield, MD, PhD
**Curriculum Vitae**

Erlanger Campus
College of Medicine
University of Tennessee
Chattanooga, Tennessee

November 2000 – June 2002
Attending Physician
St. Vincent Hospital
Pediatric Emergency Department
Indianapolis, Indiana

July 1987 – June 2000
Attending Physician
Pediatric Emergency Medicine
St. Anthony Hospital North, Lutheran Medical Center, Aurora Presbyterian Hospital, Denver General Hospital, Aurora Urgent Care, The Children's Hospital
University of Colorado
Denver, Colorado

Julia Sabine Whitefield, MD, PhD.
**Curriculum Vitae**

**University, SOM, HSC administrative duties**

Assistant Medical Director
Lifeguard Aeromedical Transport
November 2012 to May 2014
University of New Mexico
Albuquerque, New Mexico

September 2000 – June 2002
Medical Director
Pediatric Emergency Department
St. Vincent Hospital
Indianapolis, Indiana

July 1989 – June 2000
Medical Director
After Hours Pediatrics
St. Anthony Hospital North, Lutheran Medical Center, Aurora Presbyterian Hospital
Denver General Hospital, Aurora Urgent Care
University of Colorado
The Children's Hospital
Denver, Colorado

**University, SOM, HSC, department committees**

BA/MD Admissions Committee
UNM SOM
Member
October 2008 – 2013

CTSC Scholar Program
Member (scholar) – current

January 2008 – 2010
UNM SOM C-Arm Committee
Member

January 2008 – 2010
UNM SOM Lab Pediatrics Emergency Department Committee
Member

**Local, state, regional, national committees**
September 2002- June 2007
Trauma Committee, EMS-C Medical Director
Hamilton County
Chattanooga, Tennessee

2002-2006 (Liaison dates)
Committee on Pediatric Emergency Care (COPEC) for the State of Tennessee
Member
Nashville, Tennessee

22

July 1993 - June 2000
Clinical Faculty Affairs Committee
The Children's Hospital/UCHSC
Denver, Colorado

July 1998 - June 2000
Discharge Planning Committee (subcommittee to QI committee), Co-Chair
The Children's Hospital/UCHSC
Denver, Colorado

July 1997 – June 2000
QI Committee, Member
The Children's Hospital/UCHSC
Denver, Colorado

July 1992- June 1994
Physician Executive Committee, Member
Aurora Presbyterian Hospital
Aurora, Colorado

July 1989- June 1992
QI Committee, Member
Aurora Presbyterian Hospital Emergency Department
Aurora, Colorado

July 1992- June 1996
QI Committee, Member
Aurora Presbyterian Hospital for Pediatrics
Aurora, Colorado

July 1992- June 2000
QI Committee, Member
Lutheran Medical Center
Wheat Ridge, Colorado

July 1989- June 1994
QI Committee, Member
St. Anthony's Hospital North, Department of Pediatrics and Emergency Medicine
Westminster, Colorado

23

*Julia S. Whitefield M.D., Ph.D.*

*Pediatric Emergency Medicine*

*5525 N. Stanton Street Apt. 26A*

*El Paso, Texas 79912*

Telephone: 505.414.8768
Facsimile: 915.600.5610
E-Mail: JuliaWhitefield@msn.com (p)

August 31st, 2018

Ms. Karen Evans Esq.
The Cochran Firm
1100 New York Ave. NW
Suite 340 West Tower
Washington, DC 20005

**Re: Compensation Agreement for Forensic Work**

Dear Ms. Evans:

As we agreed upon in March 2016, I am sending you today my updated letter of engagement regarding H██████ W███████.

- Retainer: **$1875.00.**

- Review of documents and all other work except testimony, including, but not limited to, research, interviews of persons involved in the matter, and discussions by phone and in person with client: **$375.00 per hour.**

- Deposition testimony:
  - Local Deposition          **- $2000.00 for half-day (up to 4 hours); $4000.00 for full day.**
  - Out-of-town deposition  **- $4000.00 per day.**
  - ***Advance payment of $4000.00 is required prior to out-of-town travel.***
  - The Cochran Firm is responsible for all travel related expenses.

- Testimony at trial, mediation, or arbitration including courtroom or other hearing room waiting times as well as actual time testifying:
  - Local trial:               **- $2000.00 for half day (up to 4 hours); $4000.00 for full day.**
  - Out-of-town trial      **- $4000.00 per day**
  - ***Advance payment of $4000.00 is required prior to out-of-town travel.***
  - The Cochran Firm is responsible for all travel related expenses.

Please indicate your acceptance of these terms by signing below.

Sincerely,                                                           **ACCEPTED BY:**

*Julia Whitefield MD*

Julia S. Whitefield MD, Ph.D.

_____/_____
Sign name above              Date

_____
Print Name